IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

| | |
|---|---|
| BEATRICE LUNA, Individually and as Representative of the Estate of ISRAEL LEIJA, JR., Deceased, and CHRISTINA MARIE FLORES, as Next Friend of J.L.L. and J.V.L., Minor Children,<br><br>PLAINTIFFS,<br>vs.<br><br>DPS TROOPER CHADRIN LEE MULLENIX, in his Individual Capacity,<br><br>DEFENDANT. | CIVIL ACTION CAUSE NUMBER<br><br>2:12-CV-152-J |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A total of six rifle rounds were filed by Texas Department of Public Safety Trooper Chadrin Lee Mullenix at a fleeing automobile driven by Israel Leija, Jr., who died as a direct result of multiple wounds from that gunfire. Defendant Mullenix moves for summary judgment in this civil rights case on the basis of qualified immunity. The Plaintiffs and the Defendant have also filed counter-motions raising objections to all or parts of certain filed summary judgment exhibits.

*Background Facts*

On the evening of March 23, 2010,[1] Sgt. Randy Baker of the Tulia, Texas, Police Department was searching for Israel Leija, Jr. to serve a misdemeanor arrest warrant on Leija. At approximately 10:21 p.m., Baker spotted Leija's car at a Sonic Drive In and moved to effect an arrest. Baker approached Leija's vehicle and informed Leija that he was under arrest. Leija, who was never taken into

---

[1] The Court notes that the pleadings state two different dates on which the police shooting occurred – March 23, 2010, and October 23, 2010. Defendant Mullenix agreed in his deposition that the shooting occurred on the evening of March 23, 2010.

custody, fled the scene and headed north towards Interstate Highway Number 27 (I-27), with Baker in pursuit. Texas DPS Trooper Gabriel Rodriguez joined in the pursuit, taking the lead.

At approximately mile marker 77 of I-27, Leija entered a rural stretch of I-27 and began heading north on I-27, with Rodriguez directly behind him in pursuit. During the approximately 18 minutes that the pursuit lasted, Rodriguez followed Leija, capturing the pursuit on his video recorder.[2] Traffic on the dry roadway was light.

The pursuit proceeded north on I-27 at speeds up to 110 mph. During the entire pursuit, Leija remained on the paved portion of the road with his headlights on. Although Leija did exceed the speed limit and did refuse to stop, he did not run any vehicles off the roadway, did not collide with any vehicles, and did not cause any collisions. There were no pedestrians along the route that were in danger of being hit by Leija, and no disabled vehicles. All of the pursuit occurred in rural areas. There were no businesses or residences located in proximity to the controlled-access interstate highway. The roadway was divided by a wide center median, mostly flat, dry, and the weather that night was good.

During the pursuit, Leija twice called the Tulia Police Dispatch on his cell phone. Leija claimed that he had a gun, and that he would shoot at a police officer if they didn't back off. Leija in fact had no weapon in his possession, which would later be confirmed by law enforcement.

As the pursuit headed north on I-27, other law enforcement units joined in. Officer Troy Ducheneaux of the Canyon, Texas, Police Department deployed tire spikes underneath the overpass at Cemetery Road and I-27, about mile marker 103. Troopers Chris Ecker and Dennis Brassfield set up spikes at McCormick Road, which was north of Cemetery Road. Other police units set up spikes at a location further north, for a total of at least three spiking locations on I-27 ahead of Leija.

---

[2]   Copies of police videos are included in Plaintiffs' filed Appendix as exhibits.

DPS Trooper Chadrin Mullenix also responded to the pursuit. With knowledge that other units were setting up spikes at other locations, *possibly* including underneath the Cemetery Road overpass, Mullenix decided not to deploy his spike system. Instead, Mullenix positioned his vehicle atop the Cemetery Road bridge, about twenty feet above the I-27 roadway. Mullenix testified in his deposition that he intended to shoot down at Leija's moving vehicle as it approached, hoping that he could use his .223 caliber M-4 rifle to take out the engine block of the vehicle.[3] Mullenix testified that he had never attempted such a shot before, had not been trained for it, and had never seen such a tactic done. He testified that he had, however, been trained in shooting upwards, at moving clays, with a shotgun.

Mullenix testified that he contacted his Amarillo DPS dispatch to ask them to contact his supervisor, DPS Sgt. Robert Byrd, to – Plaintiffs' allege – "request permission" to fire at the vehicle. Mullenix denies that he requested "permission." He alleges that he did not need anyone's "permission" before he fired because, under DPS policy and the specific circumstances at that place and time, the decision to fire was up to him and him alone.

In any event, not waiting in his vehicle on a response from Sgt. Byrd, Mullenix exited his patrol vehicle, closed his car door, opened his trunk, took out his rifle, left the trunk lid open, and took a shooting position above the edge of the grassy median, near the center of the Cemetery Road bridge, on the South side. Mullenix crouched behind the concrete bridge's railing, waiting for the pursuit to arrive at his location. During this time, DPS dispatch responded that Sgt. Byrd declined to give permission to shoot, but instructed instead for Mullenix to wait and give the spikes a chance to work.

Mullenix alleges that he was unable to hear that instruction because he had failed to turn his outside loudspeakers on, thereby placing himself out of communication with his dispatch for the time

---

[3] There is no evidence in this record about the metal composition, type, weight in grains, or power of the ammunition used by Mullenix, or the metal composition of the engine block in Leija's vehicle. There is no evidence – one way or another – that any attempt to shoot out an engine block moving at 80 mph could possibly have been successful.

that it took the pursuit to arrive at his location. Mullenix did have his radio microphone on him. During the waiting minutes, Mullenix had a recorded radio conversation with Randall County Sheriff's Deputy Tom Shipman about whether Mullenix could disable the vehicle by shooting it, and how and where to shoot the vehicle to best accomplish disabling it. Nearby, north of and below Mullenix, was Officer Ducheneaux's police vehicle, which did have its external loudspeakers turned on. Plaintiffs allege that because Mullenix's trunk was open he should have been able to hear his police radio, even though his car doors were closed and his external loudspeakers were not turned on. Plaintiffs further allege that Mullenix should have been able to hear on Ducheneaux's police radio the order not to fire on Leija.

Mullenix testified that he had a clear view towards the south and was able to make out the headlights of Leija's vehicle, with Rodriguez in pursuit, as they crested a low rise south of the Cemetery Road overpass. Because of the darkness, Mullenix was unable to see any actions of Leija, anything within his vehicle, or see whether there were other people inside of the vehicle. He assumed that there were no other persons inside the vehicle because, he testified, if there were Officer Rodriguez probably would have told him about them. Rodriguez testified that he could only see the back of Leija's head and hands as Rodriguez followed in pursuit.

As the two vehicles approached, Mullenix pointed his rifle down onto Leija's vehicle and fired six rounds as the vehicle closed the gap towards the overpass. There is no testimony in this record where any of the six shots landed, except for the round or rounds which penetrated the windshield and killed Leija. There is no evidence that Mullenix hit the vehicle's radiator, hood or engine block. There is evidence that he hit Leija's upper body with four or more of his six shots.

After Leija's vehicle passed underneath the overpass, engaging the tire spike strip deployed there by Officer Ducheneaux, Leija's vehicle went out of control, rolling into the center median north of the overpass. There is evidence that, unknown to Officer Mullenix when he fired, there were at least two

vehicles passing in the southbound lanes of the interstate at this time. During the incident, Officer Ducheneaux's vehicle was parked on the center median on the north side of the bridge.

Leija was pronounced dead a short time later. The cause of death was determined to be one or more of the shots fired by Mullenix that had fatally struck Leija in the neck, shoulder, upper arm, and possibly in his face. Subsequent examination of the crime scene by the DPS accident team revealed that Leija did not have a firearm inside his vehicle, and that Leija had not recently fired a firearm.

In the immediate aftermath of the shooting, Mullenix remarked to his supervisor, Sgt. Byrd, "How's that for proactive?" Mullenix's comment referred to a counseling session earlier in the same evening, during which Mullenix had been counseled, encouraged and/or criticized by Byrd for not being "proactive" enough as a Trooper. Byrd acknowledged that Mullenix had been having personal difficulties around this time, and that Mullenix was failing to live up to Byrd's expectations of how a DPS Trooper should be doing his job.

Defendant Mullenix testified in his deposition that, as of March 23, 2010, he had never met Leija, did not have any knowledge about Leija's criminal record, had no information that Leija had ever committed a violent crime or a felony, and did not personally know Leija. Mullenix testified that he did not know what the arrest warrant for Leija was for, but did know that an arrest warrant existed and that Leija was fleeing arrest. He testified that he had no information, at the time of the shooting, to lead him to believe that Leija was suicidal in any way. He did know that Leija was speeding, had told the Tulia dispatcher that he had a weapon with him in the car, and had been informed that Leija might be intoxicated.

A subsequent DPS review of the incident by the Office of Inspector General concluded that the claim by Trooper Mullenix that he used his firearm as a tool to disable Leija's vehicle was not justified given the high speed of the fleeing vehicle, the elevated position Mullenix chose to deploy, the amount

of time Mullenix took to discuss using his firearm with Trooper Rodriguez and Deputy Shipman, and Mullenix's conversation with the DPS communications operator to request permission to shoot at Leija's vehicle. The DPS IG concluded that the evidence did not justify Mullenix's actions, and that the firearm discharge was reckless and without due regard for the safety of Canyon PD Officer Ducheneaux or Leija. The IG concluded that the evidence did not justify the use of deadly force, and that a classification of "Not Justified" was appropriate. *See* Plaintiff's Appendix Exhibit 7. The Defendant argues that the IG's conclusions are based upon inadequate information, are not reliable, are not relevant, are not properly authenticated, lack foundation, and should be ignored.

*Legal Standards*

A motion for summary judgment should be granted if the movant shows that there is no genuine issue as to any material fact. Fed. R. Civ. Pro. 56 (a). A party who moves for summary judgment has the burden of identifying the parts of the pleadings and discovery on file that, together with any affidavits, show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmovant must set forth specific facts that show a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). To determine whether a genuine issue of material fact exists, courts must resolve all ambiguities of fact in favor of the non-moving party. *Id.* Summary judgment is mandated if the nonmovaant fails to sufficiently establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).

*Qualified Immunity*

Qualified immunity is a defense that protects government officials from suit when they exercise the discretionary functions of their office. See *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). In order

to overcome a defense of qualified immunity, a plaintiff must establish that: "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established at the time of the challenged conduct." *Morgan v. Swanson,* 659 F.3d 359, 371 (5th Cir. 2011)(citing *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011)). The court may examine these factors in any order. *Pearson v. Callahan,* 555 U.S. 223 (2009) (*overruling in part Saucier v. Katz,* 553 U.S. 194 (2001)). It is the Plaintiffs' burden to present evidence that a defendant is not entitled to qualified immunity when the defense is raised. *See Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481, 489 (5th Cir. 2001).

Claims of qualified immunity are not judged on twenty-twenty hindsight, or in light of knowledge ascertained after an event, but by looking through the eyes of the officer, considering what that officer knew about the situation at the time force was used. *Graham v. Connor,* 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Poole v. City of Shreveport,* 691 F.3d 624, 630 (5th Cir. 2012).

*Constitutional Violation*

The use of deadly force for apprehension is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner,* 471 U.S. 1, 7 (1985). To support an allegation of excessive force, a plaintiff must show, "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg, Tex.,* 564 F.3d 379, 382 (5th Cir. 2009)(citing *Freeman v. Gore,* 483 F.3d 404, 410 (5th Cir. 2007). When examining whether the excessiveness was clearly unreasonable, a court should consider, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). The immediacy of the threat and the reasonableness of the use of force are contested in this case.

*Objective Unreasonableness*

The Court must also consider whether the Defendant's use of force, though a violation of the Fourth Amendment, was nevertheless objectively reasonable in light of clearly established law at the time the challenged conduct occurred. *Bush v. Strain,* 513 F.3d 492, 501 (5th Cir. 1998). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Id.* at 502 (citing *Kinney v. Weaver,* 367 F.3d 337, 350 (5th Cir. 2004)(*en banc*)(quoting *Hope v. Pelzer,* 536 U.S. 730, 740 (2002))). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham v. Connor,* 471 U.S. 386, 396-7 (1989). An officer's use of deadly force is reasonable against a moving vehicle when there exists "a credible, serious threat to the physical safety of the officer or to those in the vicinity." *Hathaway v. Bazany,* 507 F.3d 317 (5th Cir. 2007). In *Tennessee v. Garner,* the Supreme Court determined that "use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable...where the suspect poses no immediate threat to the officer and no threat to others." *Tennessee v. Garner,* 471 U.S. at 11.

*Discussion and Analysis*

The Court has considered the contested exhibits only to the extent that they are competent summary judgment evidence. The Court notes that many of the specific facts alleged by the Defendant to be "undisputed" are, in fact, strongly disputed, are speculative, are questions of reasonable interpretation for a jury, and/or are genuine issues of disputed material facts.

It was clearly established law as of March 23, 2010 that a police officer's use of deadly force is justified only if a reasonable officer in Defendant Mullenix's position had cause to believe that there was an immediate threat of serious physical harm or death to himself – which Officer Mullenix has testified did not exist in this case – or there existed at the time of the shooting an immediate threat of serious physical harm or death to others. *See Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1872 (1989). Defendant Mullenix testified during his deposition that he believed he was justified in firing on Leija because he believed there was a risk of serious injury or death to other officers, either the officer he did not see but thought might be somewhere under the Cemetery Road bridge, or to other officers further up the interstate who were setting out tire spikes, or even possibly to innocent bystanders in the cities of Canyon or Amarillo, if Leija traveled that far north.

As to the existence of an immediate risk of serious injury or death to other officers or to innocent bystanders, the summary judgment evidence in this case presents genuine issues of material fact as to whether that risk did, or did not, exist. Trooper Mullenix testified that he thought an officer was somewhere under the bridge because he saw a patrol car down there, with its overhead lightbar flashing. He did not believe Officer Ducheneaux was there, because he thought Ducheneaux was further north setting out tire spikes. Mullenix testified that he did not know who down there, or where the unknown officer was located at the time, and that he did not know whether he or she was inside or outside their patrol car or behind a bridge pillar. Mullenix testified, however, that he discharged his rifle to protect the unknown officer from possibly being fired upon by Leija as he drove by at 80 or so miles per hour, and to protect other persons Mullenix believed were farther north in possibly vulnerable positions.

There are genuine issues of fact as to whether Trooper Mullenix acted recklessly, or acted as a reasonable, trained peace officer would have acted in the same or similar circumstances. Plaintiffs have tendered evidence raising the issue whether a reasonable officer would not have fired because of the

possibly resulting increased risk to persons traveling southbound on I-27 at the time, or to Officer Ducheneaux. The evidence in the record raises the issue whether Mullenix was justified in his decision to fire six times upon Israel Leija, Jr., or whether a reasonable officer would not have fired at all given Mullenix's lack of relevant training and the caliber of weapon he utilized for this attempted stop. There are genuine issues of material fact as to whether Mullenix did or did not hear, and should have obeyed, the instructions from his superior officer to let the other officers responding to the situation first try the planned non-lethal or less-dangerous methods being utilized to end the high-speed pursuit. There also exist genuine questions of material fact as to the existence of any *immediate* threat to officers involved in the pursuit, including Officers Ducheneaux or Rodriguez, or an immediate threat to other persons who were miles away from the location of the shooting at issue in this case.

*Conclusions*

For all of the foregoing reasons, summary judgment can not be granted on the specific facts of this case. Defendant's motion for summary judgment is therefore denied.

This is not to be construed as a ruling that any summary judgment exhibit is or is not admissible as a trial exhibit. The Court will consider objections to trial exhibits when and if the specific exhibits or portions thereof are offered at trial, and proper objections are timely made.

It is SO ORDERED.

Signed this the 7th day of August, 2013.

MARY LOU ROBINSON
UNITED STATES DISTRICT JUDGE